**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **ANTONIO DAMON,** | ) |  |
|  | ) |  |
| **Plaintiff,** | ) |  |
|  | ) | **CIVIL ACTION** |
| **v.** | ) | **NO. 19-40129-TSH** |
|  | ) |  |
| **OFFICER JEFF CARLSON and** | ) |  |
| **OFFICER SHAWN FRIGON,** | ) |  |
|  | ) |  |
| **Defendants.** | ) |  |
|  | ) |  |

**MEMORANDUM OF DECISION AND ORDER**
**ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**September 25, 2023**

**HILLMAN, S.D.J.**

This is a *pro se* civil rights action against two Worcester Police Officers in their individual capacities, Officer Jeff Carlson and Officer Shawn Frigon ("Defendants").[1] Plaintiff Antonio Damon alleges that Defendants used excessive force against him when they arrested him on August 9, 2016. That conduct ultimately resulted in his conviction on 17 charges, including aggravated rape, kidnapping with sexual assault while armed, assault with a dangerous weapon, armed robbery, and carjacking. Defendants now move for summary judgment on the single claim against them. For the following reasons, the motion for summary judgment is **<u>granted</u>**.[2]

---

[1] Damon's claims against the City of Worcester were dismissed on November 18, 2019.
[2] Defendants also argue that Damon's claim is time barred because this action was not commenced until October 11, 2019, more than three months after the statute of limitations period expired. The statute of limitations issue was

**<u>Local Rule 56.1</u>**

This Court's Local Rules provide that a motion for summary judgment "shall include a concise statement of the material facts of record as to which there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation ... A party opposing the motion shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation ... . Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties." L.R. D.Mass. 56.1.

Although Damon is proceeding pro se, he is required to comply with this Court's procedural rules. Therefore, he was required to file a Rule 56.1 statement setting forth the facts which he contends are in dispute with citations to supporting documentation. While Damon did file a timely "Statement of Material Disputed Facts" and separately, a "Statement of Disputed Factual Issues" in opposition to Defendants' motion, the former largely consists of Damon's arguments and opinions regarding Defendants' L.R. 56.1 statements and the latter contains seven contentions by Damon that he believes to be of issue in the case. Damon has failed to comply with the requirements of L.R. 56.1 in that most of the factual assertions do not cite to the record and contain argument and conclusory assertions. The First Circuit counsels that the courts be "solicitous of the obstacles that pro se litigants face, and while such litigants are not exempt from procedural rules, we hold pro se pleadings to less demanding standards than those drafted by lawyers and endeavor, within reasonable limits, to guard against the loss of pro se claims due

---

decided by the Court when it allowed the case to proceed following a response from Damon to the Court's show cause order. *See* Docket No. 7.

to technical defects." *Dutil v. Murphy*, 550 F.3d 154, 158 (1st Cir. 2008). Therefore, the Court will consider Damon's statements of fact to the extent that it will not consider factual averments that have no support in the record, and those factual averments that contain argument or conclusory assertions.

<u>Background</u>

In the light most favorable to Damon as the non-moving party, the material facts are as follows. On August 9, 2016, Damon was in the back hallway of a business, J.B. Express, located at 5 Denny Street in Worcester, in his words, "with the intention of using drugs." The business had a locked door that requires a customer to be allowed into the business. On the evening of August 9, 2016, the owner of the business called 911 to report a robbery, which prompted Worcester Police Officers Jeff Carlson and Shawn Frigon to respond to the location.

Damon stated that he "was in the back hallway of [the business] using drugs," when he was asked to leave. Damon stated that he refused to leave, he began arguing with a customer, and he kicked a door in the back hallway of the business. After kicking the door, Damon stated that he saw Officers Carlson and Frigon approaching, at which point Damon claims that he attempted to flee from the officers, running toward the rear exit of the building.[3] According to his Complaint, Damon was then "captured" by the officers, who proceeded to beat, kick, and spit in his face. Damon contends that the use of force by officers necessitated that he receive medical treatment. Damon further contends that, in a subsequent interview with an investigator, the

---

[3] Damon waivers between denying trying to escape and invoking his privilege against self-incrimination. However, Damon also includes two references to his running away from the Officers in his own Statements, *see* Document No. 156, ¶ 17 ("While Mr. Damon may or may not have cooperated in the 5 Denny St. business while being arrested …") and Docket No. 157, ¶ 3 ("Whether the plaintiff offered any resistance beyond the initial attempt to flee from defendants …").

owner of the business shifted course, indicating that she had not been robbed, that no money had been taken and that she had been mistaken in her report.

Earlier, when Officer Frigon had responded to the area of North Ashland Street in order to assist in the search for a carjacking suspect, described as a tall black male wearing a white t-shirt, Frigon then received another report of a possible armed robbery at 5 Denny Street. Frigon recognized that the description of the male suspected in the armed robbery matched the description of the suspect in the carjacking and kidnapping. Frigon also realized that the location of the armed robbery was  very close to the location where the unoccupied carjacked vehicle had been discovered.

At this point, Officer Carlson had separately received information concerning multiple major crimes, including a sexual assault and a separate carjacking and kidnapping that had been committed close in time and location by a suspect described as an armed black male in a white shirt. When Carlson heard that the carjacked vehicle was located on North Ashland Street and that a Massachusetts State Police K-9 was going to attempt a track of the suspect from that location, Carlson proceeded to the area to assist.

Officer Carlson was enroute when another report was received, this time concerning an armed robbery at 5 Denny Street. Carlson realized that address was close to the location where the carjacked vehicle had been located, so he proceeded to Denny Street. When he arrived there, he saw a female running south on Denny Street and he heard an officer yell to secure the yellow building, a reference to 5 Denny Street, at which point Carlson proceeded that location.

As Officer Carlson approached the building, he saw a male exit the building and, while pointing back toward the building, yell "he" was "in there." Officer Frigon, also arrived and observed a male running out of the building yelling "he's in there, he's in there." Both Officers

4

Carlson and Frigon entered the building. At that time, Frigon saw a male matching the description of the suspect crouched down in a corner of the porch. The male later was identified as Damon. Damon, during his deposition, invoked his privilege against self-incrimination when asked where he was when he first saw a police officer on August 9, 2016 and also invoked the privilege when asked whether the officer was alone.

During his deposition, Damon testified that he was given no verbal commands to show his hands. He argues that if such commands were given, they would be on a recording that Damon says he possesses but has not produced because he believes he still has time to produce the evidence. Defendants possess the 911 recording of the business owner's call and, at approximately 5:00 of the recording, sounds can be heard of additional persons arriving. While not everything that was said is decipherable, verbal commands to get on the ground, to show hands, to "show me your f***ing hands" and "give me your hands" are audible on the recording. That recording confirms the accuracy of Officer Frigon's affidavit, where he attests that he gave verbal commands for Damon to show his hands. The recording also captures objectively the length of time it took to complete the arrest of Damon. Officer Carlson describes Damon as screaming as he was being arrested and resisting that arrest and, at approximately 5:44 of the recording, a male stating "get him up." The arrest of Damon contained a number of verbal commands, which take less than one minute to complete to the point of getting Damon to his feet.

At various points during his deposition, Damon claimed that he had the evidence to "prove" what happened during his arrest, which included video footage showing the officers using excessive force on him. Damon has not provided video evidence to the Defendants, despite repeated requests. The business owner, testified at Damon's criminal trial that, while she had five

cameras at the business, there was no camera in the back porch area of the business where Damon was arrested.

Officer Frigon took hold of Damon's left arm and ordered him to go to the ground, at which point Frigon saw Damon lower his right arm toward the ground and out of Frigon's view. Frigon ordered Damon to keep his hand up and Frigon performed an arm-bar takedown to bring Damon to the ground. Damon identifies Officer Carlson as the officer who performed the arm-bar takedown. On the ground and within the reach of Damon, Frigon observed a pair of scissors. The scissors are observable in multiple photographs that depict the area of the enclosed porch where Damon was found and where he was arrested.

Damon testified at his deposition that the two officers beat him, but invoked his privilege against self-incrimination when asked what the officers looked like and what parts of his body they touched. Damon indicated that he did not see any other officers. Officer Frigon has attested that several other officers arrived and attempted to assist him, and that Damon refused to place his hands behind his back and actively resisted attempts to arrest him. When Officer Carlson arrived at the scene, he entered the enclosed porch area and heard officers yelling "police!" Another officer yelled "watch the knife" as Damon was being brought to the floor. Carlson moved into a position to take hold of Damon's left wrist, trying to bring it toward Damon's back in order for him to be handcuffed. Damon resisted and tried to pull his wrist away while screaming.

As the struggle to get Damon under control continued, Officer Carlson observed a metal blade sticking out of a white cloth or shirt on the ground and that was within the reach of Damon as officers were trying to handcuff him. At the time that Officer Carlson made his observation, he saw a metal blade but did not see any handle, causing Officer Carlson, who also had heard an

officer yell to watch the knife, to believe that the item was a knife, not a pair of scissors. The crime scene photographs taken of the area where Damon was arrested show a pair of scissors wrapped in a white shirt or shirt but, at the time Officer Carlson made his observation, the material was positioned in a way that caused him to see more of the blade and none of the handle.

At the time of Damon's arrest, Officer Frigon knew that Damon was a suspect in a carjacking and kidnapping, that he was a suspect in an armed robbery, that Damon was resisting arrest, and that there was a pair of scissors near Damon and within his reach. Frigon punched Damon several times while trying to subdue him. At the time of Damon's arrest, Officer Carlson knew that Damon was a suspect in a sexual assault, a separate carjacking, kidnapping and an armed robbery. Carlson knew Damon had a metal blade, which Carlson believed to be a knife, within Damon's reach. Carlson delivered several knee strikes to Damon while trying to subdue him and place him in handcuffs.

On August 10, 2016, the day after Damon was arrested, he was interviewed by members of the Worcester Police Department, including Detective Michael Tarckini. In addition to stating that he could not remember all of the events of the prior day because he had been using drugs and alcohol for days and was "mad high" and had been in a dreamlike state that featured periods of blackouts. Damon said that he had been hit, punched, and spit upon during his arrest.

Following Damon's arrest, Damon was indicted by two separate grand juries. In one matter, *Commonwealth v. Antonio L. Damon*, Worcester Superior Court Docket No.: 1785CR00030, Damon was indicated for operating a motor vehicle recklessly or negligently and so as to endanger; and leaving the scene of an accident with property damage, with both offenses stated as having occurred on August 9, 2016. According to the docket, Damon was convicted of

the negligent operation charge and acquitted of the leaving the scene charge. Damon was indicated by a separate grand jury on nineteen charges arising out of his actions on August 9, 2016 Damon was charged with: (1) three counts of felony aggravated rape (charges one, two and three); (2) felony kidnapping with sexual assault while armed (charge four); (3) two counts of felony strangulation or suffocation (charges five and ten); (4) two counts of misdemeanor assault and battery (charges six and fourteen); (5) felony assault with a dangerous weapon (charge seven); (6) felony kidnapping (charge eight); (7) felony carjacking (charge nine); (8) felony assault to rape (charge eleven); (9) felony indecent assault and battery upon a person over the age of fourteen (charge twelve); (10) felony witness intimidation (charge thirteen); (11) felony breaking and entering in the daytime placing a person in fear (charge fifteen); (12) two counts of felony armed robbery (charges sixteen and seventeen); (13) and two counts of felony assault with a dangerous weapon (charges eighteen and nineteen). Prior to trial, charge seventeen, one of the felony armed robbery counts, was subject to a *nolle prosequi* and was dismissed.

The remaining charges proceeded to a jury trial and on November 9, 2017, the jury returned verdicts of guilty on seventeen of the eighteen charges; there was a not-guilty verdict was on the felony witness intimidation charge. On November 22, 2017, the Commonwealth dismissed one of the aggravated rape charges as duplicative. Damon was sentenced to a term of imprisonment of up to thirty years, with his various sentences to run concurrently to the thirty-year term for the kidnapping with sexual assault while armed conviction. Damon sought sentence review from the Appellate Division of the Superior Court and, as a result of that filing, Damon's sentence was increased to a term of not less than thirty-five years and not more than forty years.

## **Standard of Review**

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (*citing* Fed. R. Civ. P. 56(c)). " 'A "genuine" issue is one that could be resolved in favor of either party, *304 and a "material fact" is one that has the potential of affecting the outcome of the case." *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (*quoting Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Sensing*, 575 F.3d at 153. The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.*, at 152. " 'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.' " *Id.* (citation to quoted case omitted). " '[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial." *Id.* (citation to quoted case omitted). The nonmoving party cannot rely on "conclusory allegations" or "improbable inferences". *Id.* (citation to quoted case omitted). " 'The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ' " *Id.* (citation to quoted case omitted).

**Discussion**

The Defendants assert that they are entitled to summary judgment on Damon's Section 1983 excessive force claim because they did not use excessive force to effectuate his arrest and therefore, there has been no Fourth Amendment violation. In the alternative, they argue that they are entitled to qualified immunity. Damon, on the other hand, argues that he was punched, kneed and put into a choke hold during his arrest by Officers Frigon and Carlson, and there is a genuine issue of material fact as to how he sustained his injuries.

In order to establish a claim under Section 1983, Damon must establish that a person acting under the color of law denied him a right secured by the constitution or by federal law. Defendants concede that they were acting under the color of law and therefore, the issue before the Court is whether they violated Damon's Fourth Amendment constitutional right by using excessive force when arresting him.

When a police officer arrests an individual, he violates that individual's rights under the Fourth Amendment when using more force than is objectively reasonable under the circumstances. *Graham v. O'Connor*, 490 U.S. 386, 396-397 (1989). Whether the force used was objectively reasonable requires a fact-specific inquiry of the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Jennings v. Jones*, 499 F.3d 2, 11 (1st Cir. 2007) (*quoting Graham*, 490 U.S. at 396). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. The Court also must consider "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

evolving—about the amount of force that is necessary in a particular situation" and that "[n]ot

every push or shove ... violates the Fourth Amendment." *Id*., at 396–97 (internal quotation marks

and citation omitted). The officer's subjective motivation is irrelevant to the analysis. *Id*., at 397.

The Supreme Court has instructed courts to consider three factors when evaluating

excessive force claims that arise in the course of arrest: (1) "the severity of the crime at issue,"

(2) "whether the suspect poses an immediate threat to the safety of officers or others," and (3)

"whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. "[N]ot every

push or shove" will substantiate an excessive force claim, but "serious injury" is not required.

*Gaudreault v. Salem*, 923 F.2d 203, 205 (1st Cir. 1990); *Bastien v. Goddard*, 279 F.3d 10, 14-15

(1st Cir. 2002). Where, as here, "the parties offer diametrically opposite versions of the facts,

each founded on first-hand knowledge, [the court] must ask whether the account propounded by

the nonmovant suffices to thwart the swing of the summary judgment ax." *Morelli v. Webster*,

552 F.3d 12, 18 (1st Cir.2009).

As to the first *Graham* factor, at the time of Damon's arrest the Officers were called to

the scene of several violent crimes. Officer Frigon knew that Damon was a suspect in a

carjacking and kidnapping, that he had abandoned a stolen vehicle and he was a suspect in an

armed robbery committed close in time and space to the abandoned vehicle. Officer Carlson, at

the time of the arrest, knew that Damon was a suspect in a sexual assault, a suspect in a separate

carjacking and kidnapping, and an armed robbery. The first *Graham* factor favors the

Defendants.

Regarding the second factor, the Court finds that Damon posed an immediate threat to the

safety of the Officers and to others at the scene. It is the sworn testimony of two third party

witnesses at the scene that Damon threatened them with a "bladed weapon" just minutes before

the arrest, one whom identified the weapon as a pair scissors later recovered from the immediate

area of Damon's arrest. Officers Frigon and Carlson observed the potentially dangerous weapon,

the scissors, on the floor when apprehending Damon.[4]

The final *Graham* factor – whether Damon was actively resisting arrest – favors

Defendants as well. Although he denied being given verbal commands to show his hands, or to

comply with the Officers' commands, Damon's testimony and own statements on the record

suggests otherwise. The Court is not obliged to adopt Damon's contradicted statement in his

memorandum, even as the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007)

(when a non-moving party's contention at summary judgment is blatantly contradicted by the

record, such that no reasonable jury could believe it, a court should not adopt it for purposes of a

summary judgment ruling)

It is not the Court's role to evaluate the credibility of witness testimony, but I must

evaluate the strength of the evidence which supports that testimony to determine whether there is

enough support for the Damon's claims. In this case, the evidence is simply inadequate for a

reasonable factfinder to find that Officers Carlson and Frigon used excessive force against the

Damon during his arrest, even when viewed in the light most favorable to the him.

Keeping in mind that "police officers are often forced to make split-second judgments, in

circumstances that are tense, uncertain, and rapidly evolving, about the amount of force that is

necessary in a particular situation," the Court concludes that the force used by Defendants under

these circumstances was objectively reasonable to gain control of the situation, see *Graham*, 490

U.S. at 397, and that no reasonable jury could conclude otherwise.

---

[4] Damon denied that he had scissors, replied that scissors belonged to the store, and then invoke his privilege against self-incrimination as to the issue.

## <u>Conclusion</u>

For the reasons stated above:

- Defendants' Motion for Summary Judgment (Docket No. 151) is **<u>granted</u>** as to all claims; and
-
- Defendant's Motion for Sanctions (Docket No. 150) is **<u>denied</u>**.

/s/ Timothy S. Hillman

TIMOTHY S. HILLMAN

UNITED STATES SENIOR DISTRICT JUDGE

**SO ORDERED**.